NO. 07-09-0290-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

FEBRUARY 10, 2010

_____

JOSE EVER GONZALEZ-GILANDO,

Appellant

v.

THE STATE OF TEXAS,

_____

FROM THE 69TH DISTRICT COURT OF HARTLEY COUNTY;

NO. 1018H; HON RON ENNS, PRESIDING
_____

***OPINION***
_____

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

Jose Ever Gonzalez-Gilando pled guilty to possession of a controlled substance with intent to deliver. On appeal, he challenges the trial court's denial of his motion to suppress contending there was no reasonable suspicion for an investigative stop. We agree and reverse the judgment.

*Background*

On November 19, 2008, Troopers Chad Foster and Jacob Gamez were on patrol on Highway 385 in Hartley County. The highway, purportedly, was a main traffic route for drug dealers. The officers observed a vehicle pass them in the opposite direction and

decided to turn and follow it. They grew suspicious of whom they saw because 1) the vehicle in which they rode was clean or lacked road grime, 2) the young occupants did not "fit" the year and model of the vehicle, the latter being a '99 Lumina, 3) the troopers thought the vehicle's occupants should have been in a sportier car, 4) both occupants simultaneously looked away from the officers as the vehicles met and passed, 5) the occupants turned their hats around so they faced forward after passing the troopers, 6) the car slowed and came to almost a complete stop at a blinking caution light adjacent to an intersection, and 7) the driver drove within the speed limit.

The troopers also checked a computer database to determine whether the vehicle in question was lawfully registered and whether it was covered by liability insurance. While it was discovered that the car was lawfully registered, the information regarding insurance was unavailable. In other words, the information garnered from the database did not provide the troopers basis to confirm whether or not such insurance existed. According to one trooper, the circumstance meant the car could or could not have been covered. Because they concluded that they could not stop the car, they decided to call a local deputy sheriff (Fowler) to intercede.[1]

---

[1] This is somewhat reminiscent of the Life commercials of yesteryear where the older siblings were hesitant to taste the cereal. So, they decided to call "Mikey" because "Mikey would eat anything." Maybe each of us is guilty of doing this at one time or another.

Fowler responded, caught up with the moving vehicles, placed his patrol unit between that in which appellant rode and that of the troopers, ran the license plate, and also determined that the vehicle he was following had a current registration. So too did his search for the existence of potential liability insurance result in the discovery that the information was "not available" or the status "undocumented." Nonetheless, he decided to conduct a traffic stop of appellant and his companion. The stop eventually resulted in the discovery of the controlled substances underlying appellant's conviction.

*Standard of Review*

We review the trial court's ruling on a motion to suppress under the standard discussed in *Ford v. State,* 158 S.W.3d 488 (Tex. Crim. App. 2005). It requires us to give great deference to the trial court's interpretation of historical fact and assessment of a witness' credibility. *Id.* at 493. However, we need not give such deference to its application of the law to the facts, especially when those facts are undisputed. *Neal v. State,* 256 S.W.3d 264, 281 (Tex. Crim. App. 2008), *cert. denied,* __ U.S. __, 129 S.Ct. 1037, 173 L.Ed.2d 471 (2009). In that situation, we consider the matter *de novo. Id.*

*Applicable Law*

Next, law enforcement personnel may briefly detain and investigate a person when they have a reasonable suspicion that the person is involved in criminal activity. *State v. Sheppard,* 271 S.W.3d 281, 287 (Tex. Crim. App. 2008). The officer must be able to point to something that would lead a reasonable person to believe that the person being detained was engaged in, had engaged in, or was about to engage in a criminal act. *Klare v. State,* 76 S.W.3d 68, 72 (Tex. App.–Houston [14th Dist.] 2002, pet. ref'd). Those specific articulable facts must amount to more than a mere hunch or suspicion. *Davis v.*

3

*State,* 947 S.W.2d 240, 244 (Tex. Crim. App. 1997). And, we look at the totality of the circumstances in determining reasonable suspicion. *Ford v. State,* 158 S.W.3d at 492-93. Finally, the subjective intent of the officer has no bearing on the matter. *Id.* at 492.

*Application of Law to Facts*

Regarding the indicia other than that concerning insurance, none evinced criminal activity or a reasonable suspicion that criminal activity was afoot. This is so irrespective of whether they are viewed separately or *en masse.*

It is not a crime in this State to drive a clean car, look away from passing police officers, drive a vehicle of one's choice, obey traffic warnings, and abide by posted speed limits. Nor did either the State or officers proffer reasonable explanation as to how one could rationally interpret such conduct as potentially criminal. For instance, we are left to guess at why a young adult driving an older car insinuated that he was a criminal. Moreover, accepting such a proposition would be tantamount to concluding that only those young adults without sufficient means to acquire a newer car engage in criminal activity, and such is not the case. Similarly insupportable is the notion that following traffic laws and heeding traffic warnings connotes some manner of misconduct. Rather, following the law tends to suggest that one is engaging in lawful activity, and we hesitate to conclude otherwise without basis for doing so.

As for looking away from police officers, that too is a highly dubious indicia since others have opined that looking at officers is equally suspicious. *E.g., U.S. v. Barnard,* 553 F.2d 389, 391-92 (5th Cir. 1977). If one acts suspiciously by both looking at and away from the police, then that seems to leave no option other than to move around with

4

eyes closed. Of course, the police would most certainly deem the latter grounds for a stop if undertaken by someone driving (and rightly so). From early school days, many come to believe that avoiding eye contact with authority figures is a way to avoid notice or otherwise be left alone. A student looking down in the classroom upon the teacher asking a question does not *ipso facto* mean the student committed a misdeed. The same can be said of those who look away from law enforcement officials while driving on the roadway. And, the State failed to explain why the contrary is true.

And, while it may be true that innocent people often drive dirty cars, that hardly means that those driving newly washed cars are violating or are about to violate the law, and vice-versa.

It seems as though the situation before us exemplifies the nature of criminal conduct in general. Simply put, criminality encompasses most any imaginable fact or circumstance. Criminals come in all makes and colors. Some have hair, some do not. Some are men, some are not. Some drive cars, some do not. Some wear suits, some do not. Some have baseball caps, some do not. Some want attention, some do not. Some have nice cars, some do not. Some eat spaghetti, some do not. And, sometimes, some even engage in innocent activity. Yet, just because an officer once encountered a bald male who ate spaghetti while wearing a suit who later drove away in a particular car and ultimately engaged in criminal conduct does not permit him to rationally deduce that everyone else who happens to do the same things may also be engaging in misconduct. The same is no less true here. It may well be that the officers have seen young people who drive older cars and obey traffic laws engage in illegal activity. But,

5

that does not mean it is reasonable to infer that all, most, or some other young people who do likewise must be breaking the law.

People are free to drive any type of vehicle they choose, slow at a blinking yellow light, look at whom they choose while driving, and maintain a speed below the limit without expecting to be pulled over by law enforcement officers. *See Klare v. State,* 76 S.W.3d at 72 (stating that innocuous conduct alone does not justify an investigative stop); *Sieffert v. State,* 290 S.W.3d 478, 484-85 (Tex. App.–Amarillo 2009, no pet.) (concluding that driving a vehicle through a high crime area late at night at a speed lower than the speed limit while appearing nervous did not evince reasonable suspicion to believe criminal activity was afoot). Moreover, our decision remains the same even when we factor into the equation the information at bar regarding the existence of insurance, or lack thereof.

Drivers are required to maintain proof of financial responsibility to lawfully drive on our public roads. *See* TEX. TRANSP. CODE ANN. §601.051 (Vernon 1999). Furthermore, modern technology has apparently given police officers the means to assess one's compliance with that requirement without stopping the individual. Here, however, the information obtained by the officers while pursuing those technological means was hardly suggestive of anything other than the unknown. Again, the officers simply were informed that the data they desired was unavailable. And, while Fowler unilaterally opined that this "led him to believe that the vehicle did not have insurance coverage,"[2] without other evidence developing the source of the information comprising

_____

[2]A trooper testified otherwise, saying that "they could have insurance or they may not have insurance."

6

the database, explaining what was meant when insurance information was unavailable, explaining why such information would be unavailable, illustrating the accuracy of the database, establishing the timeliness of the information within the database, depicting how often those using the database were told that insurance information was unavailable, proving that the program through which the database was accessed was even operating at the time, and the like, we cannot accept the deputy's inference as reasonable.[3]

Given the absence of the evidence described above, we can only liken the indication that the information was unavailable to "who knows," and "who knows" falls short of being an articulable fact upon which reasonable suspicion can be founded. Thus, the State failed to carry its burden and prove that the stop at issue was based on either reasonable suspicion or probable cause and, thereby, was legitimate. This, in turn, leads us to conclude that the trial court erred in denying appellant's motion to suppress.

Without the drugs ultimately discovered in the car, the State had little or no evidence of appellant's guilt. Thus, authorizing their use to convict him was harmful. Accordingly, we reverse the judgment and remand the cause to the trial court.


Brian Quinn
Chief Justice

Publish.

---

[3]The State argues in its brief that, pursuant to the Texas Administrative Code, the reliability rate of the information provided by insurers must meet 95% by January 1, 2008. *See* 28 TEX. ADMIN. CODE §5.605(b) (2009). However, nothing in the record shows that the administratively-required goal was attained.