**REVERSE and REMAND and Opinion Filed February 27, 2024**



In The
## Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-22-00544-CR

### THE STATE OF TEXAS, APPELLANT

### V.

### MARTIN EDUARDO VELASQUEZREYES, APPELLEE

**On Appeal from the County Criminal Court No. 1
Dallas County, Texas
Trial Court Cause No. M1922423**

### MEMORANDUM OPINION
Before Chief Justice Burns, Justice Carlyle, and Justice Garcia
Opinion by Chief Justice Burns

In this case, the State appeals the trial court's order granting a motion to suppress. Appellee Martin Eduardo Velasquezreyes was charged with driving while intoxicated arising from a traffic stop based on a failure to maintain a single lane of traffic and unconfirmed insurance.[1] Appellee filed a motion to suppress the

---

[1]We note the violation for failure to maintain proof of financial responsibility for a vehicle is titled "Requirement of Financial Responsibility." *See* TEX. TRANSP. CODE ann. § 601.051. Throughout the hearing and in the briefing, however, the witnesses and parties continually used the commonly known vernacular of "driving without insurance" to refer to this section of the transportation code.

fruits of the stop of his vehicle averring the police officer did not have reasonable suspicion to initiate the traffic stop. After a hearing, the trial court granted the motion and suppressed all evidence derived from the traffic stop. We reverse the trial court's suppression order and remand this cause to the trial court for further proceedings consistent with this opinion.

## I.    Background

Officer Nickolas Delgado has been a police officer with the city of Farmer's Branch for five years. Before moving to Texas, he was a sheriff's deputy in California for six years. On the day of this stop, Officer Delgado's trainee entered appellee's license plate into the in-car computer system and saw that appellee's car's insurance was "unconfirmed." Officer Delgado pulled appellee over due to the unconfirmed insurance. Appellee was eventually arrested for driving while intoxicated.

Appellee filed a motion to suppress claiming that the officers did not have reasonable suspicion to stop him. At the hearing, appellee argued Officer Delgado's testimony was essentially that appellee "may or may not have had insurance," and that this was not enough for reasonable suspicion.

---

We also note that the State does not rely on appellee's failure to maintain a single lane of traffic as support for the officer's stop of his car. After the suppression hearing, the Court of Criminal Appeals held that a driver's failure to maintain a single lane is no longer a traffic offense in itself. *See generally State v. Hardin*, 664 S.W.3d 867 (Tex. Crim. App. 2022).

At the suppression hearing, Officer Delgado testified to his eleven years of law enforcement experience and his five years of traffic enforcement in Farmer's Branch. Officer Delgado testified that he uses his in-car computer system "every single day," and he runs a registration and insurance check on "every single" vehicle he pulls over. In his experience, the information he receives from the computer database is reliable. He explained that, typically, unconfirmed "means that the insurance information on file is either out of date or expired, or there is no insurance." Further, he explained that a return of "confirmed" means "there is valid insurance . . . associated with the vehicle."

During his testimony Officer Delgado admitted, however, he did not know everything about the computer system in his patrol car. He referred to the in-car computer system as "CAD," but on cross-examination, he conceded he could not remember what the "A" stood for. Additionally, he testified he was aware the computer accessed various databases, and the insurance information came from the state, but he did not know who entered the data into the state insurance database or what the security requirements for the database were. Ultimately, Officer Delgado testified that in his experience, the database had proven to be reliable.

The trial court subsequently issued an order granting the motion to suppress, along with findings of fact and conclusions of law. The trial court found that

Officer Delgado and his trainee learned from the in-car computer system that appellee had "unconfirmed" insurance. The court further found that Officer Delgado believed he had reasonable suspicion for a traffic stop based on the return of unconfirmed insurance.

In its conclusions of law, however, the trial court concluded that the officers did not have reasonable suspicion for the traffic stop. The trial court concluded that "Officer Delgado did not testify to the requisite knowledge and experience to say that the in-car computer system is reliable enough to establish reasonable suspicion for a traffic stop for unconfirmed insurance." Based on this conclusion, the court ordered "all evidence derived from the traffic stop" suppressed.

## II.    Standard of Review

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We review the trial court's factual findings for an abuse of discretion— meaning we give almost total deference to the trial court's resolution of issues of historical fact and credibility determinations so long as they are supported by the record. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007). However, we review the trial court's application of the law to the facts de novo. *Id.*

Here, as set out above, the trial court ultimately concluded that "Officer Delgado did not testify to the requisite knowledge and experience to say that the

4

in-car computer system [was] reliable enough to establish reasonable suspicion for a traffic stop for unconfirmed insurance." This is a legal conclusion—a conclusion about the legal significance of the facts as the trial court found them to be. Accordingly, the ultimate question of whether Officer Delgado had reasonable suspicion to stop appellee's car is an issue that we review de novo. *Id.*

## III. Applicable Law

### A. Reasonable Suspicion to Conduct a Temporary Detention

The Fourth Amendment of the United States Constitution protects against unreasonable searches and seizures. *Atkins v. State*, 882 S.W.2d 910, 912 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd); *see* U.S. CONST. amend. IV. Yet, not every encounter between law enforcement officers and citizens implicates constitutional protections. *Hunter v. State*, 955 S.W.2d 102, 104 (Tex. Crim. App. 1997). Interactions between law enforcement officers and citizens are often characterized as consensual encounters, investigative detentions, or arrests. *State v. Woodard*, 341 S.W.3d 404, 410–11 (Tex. Crim. App. 2011); *Crain v. State*, 315 S.W.3d 43, 49 (Tex. Crim. App. 2010). Arrests require either a warrant or probable cause, while investigative detentions constitute brief seizures that are less intrusive than arrests and require only reasonable suspicion. *Derichsweiler v. State*, 348 S.W.3d 906, 914–17 (Tex. Crim. App. 2011); *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009).

5

Reasonable suspicion exists when, based on the totality of the circumstances, an officer has specific, articulable facts that when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). Reasonable suspicion is a lower measure of suspicion than probable cause, and probable cause "falls far short of a preponderance of the evidence standard." *Baldwin v. State*, 278 S.W.3d 367, 371 (Tex. Crim. App. 2009). Reasonable suspicion is also an objective standard that disregards any subjective intent of the officer making the stop and looks solely to whether an objective basis for the stop exists. *Ford*, 158 S.W.3d at 492.

### 1. Information obtained from a police officer's check of a vehicle's license plate may form reasonable suspicion.

Generally, an officer may use information obtained from checking a vehicle's license plate in a computer database to form reasonable suspicion that the driver has been, or soon will be engaged in criminal activity. *See Delk v. State*, 855 S.W.2d 700, 709–10, 712 (Tex. Crim. App. 1993) (concluding officers had reasonable suspicion to question defendant after officer "ran a license check on a vehicle" in law enforcement database, and computer indicated car had been stolen from homicide victim); *Villarreal v. State*, 631 S.W.3d 198, 203 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (holding that officer's testimony showing reliability of databases and his experience with them was sufficient to show

6

reasonable suspicion that vehicle was unregistered based on no record return). Moreover, "[t]he State is not required to show a traffic offense was actually committed, but only that the officer reasonably believed a violation was in progress." *Tex. Dep't of Pub. Safety v. Fisher*, 56 S.W.3d 159, 163 (Tex. App.— Dallas 2001, no pet.); *accord Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001).

### 2. The possibility of an innocent explanation for the conduct does not negate an officer's reasonable suspicion of criminal conduct.

The Supreme Court has held that the possibility of an innocent explanation for conduct does not prevent an officer from entertaining reasonable suspicion of criminal conduct. *Navarette v. California*, 572 U.S. 393, 403 (2014). Specifically, the Supreme Court stated, "[e]ven in *Terry*, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation."[2] *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). Further, the Court stated:

> In allowing such detentions, *Terry* accepts the risk that officers may stop innocent people. Indeed, the Fourth Amendment accepts that risk in connection with more drastic police action; persons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent. The *Terry* stop is a far more minimal intrusion, simply allowing the officer to briefly investigate further. If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way.

---

[2]*See Terry v. Ohio*, 392 U.S. 1 (1968).

*Id.* at 126. The Texas Court of Criminal Appeals has said the same. *See Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997) ("[T]he 'as consistent with innocent activity as with criminal activity' construct is no longer a viable test for determining reasonable suspicion."). Later, in *Leming v. State*, 493 S.W.3d 552 (Tex. Crim. App. 2016), the Court of Criminal Appeals further discussed the issue of reasonable suspicion and the possibility of innocent conduct. When analyzing whether an officer had reasonable suspicion to stop a vehicle, the Court of Criminal Appels held:

> A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct. "The possibility of an innocent explanation does not deprive the [detaining] officer of the capacity to entertain reasonable suspicion of criminal conduct. Indeed, the principal function of his investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal[.]"

*Id.* at 562 (internal citations omitted).

The Fourteenth Court of Appeals applied the Court of Criminal Appeals's holdings in *Woods* and *Leming* when it decided *Villarreal v. State.* In *Villarreal*, a police officer initiated a traffic stop based solely on the fact that the officer's in-car computer search of a truck's registration indicated "no record." 631 S.W.3d at 202. After holding that the officer had reasonable suspicion to stop the truck, the Court held:

> The possibility of an innocent explanation for the "no record" return (e.g., that the truck was newly registered) did not prevent the officer from reasonably suspecting that the vehicle was unregistered based on

the "no record" return. The officer justifiably stopped appellant to resolve the ambiguity.

*Id.* at 205 (internal citations omitted). As the Court of Criminal Appeals pointed out, the purpose of the detention is to *investigate*. "It is, after all, only an 'investigative' detention. So long as the intrusion does not exceed the legitimate scope of such a detention and evolve into the greater intrusiveness inherent in an arrest-sans-probable-cause, the Fourth Amendment will tolerate a certain degree of police proaction." *Derichsweiler*, 348 S.W.3d at 916.

Similarly, the Fifth Circuit Court of Appeals examined whether a police officer who stopped a vehicle after his in-car computer insurance search returned as "unconfirmed" had reasonable suspicion to do so. *United States v. Broca-Martinez*, 855 F.3d 675 (5th Cir. 2017). After holding that the officer had reasonable suspicion to stop the vehicle based on the unconfirmed return, the Court pointed out:

> Even if [the officer] was not positive Broca-Martinez was uninsured, he cleared the bar for reasonable suspicion. An officer does not have to be certain a violation has occurred. "This would raise the standard for reasonable suspicion far above probable cause or even a preponderance of the evidence, in contravention of the Supreme Court's instructions."

*Id.* at 681 (internal citations omitted); *see also United States v. Miranda-Sotolongo*, 827 F.3d 663, 669 (7th Cir. 2016) ("Reasonable suspicion . . . does not require the officer to rule out all innocent explanations of what he sees.").

9

**B.     Traffic Stops Based on "Unconfirmed Insurance" Returns**

Drivers in Texas must maintain proof of financial responsibility for their vehicles.[3] *See* TEX. TRANSP. CODE ann. § 601.051. Operating a vehicle for which financial responsibility has not been established is a misdemeanor punished by a fine. *See id.* § 601.191. Therefore, a police officer may conduct a traffic stop when the officer's in-car database indicates that a driver may be operating the vehicle without insurance. *See e.g., Blankinship v. State*, No. 05-19-01436-CR, 2022 WL 336560 at *3 (Tex. App.—Dallas Feb. 4, 2022, no pet.) (mem. op., not designated for publication); *Ellis v. State*, 535 S.W.3d 209, 215 (Tex. App.—Fort Worth 2017, pet. ref'd); *Oliva-Arita v. State*, No. 01-15-00140-CR, 2015 WL 7300202 at *3 (Tex. App.—Houston [1st Dist.] Nov. 19, 2015, no pet.) (mem. op., not designated for publication).

The Fifth Circuit has joined other federal circuit courts in holding that "a state computer database indication of insurance status may establish reasonable suspicion . . . *as long as there is either some evidence suggesting the database is reliable or at least an absence of evidence that it is unreliable.*" *Broca-Martinez,* 855 F.3d at 680 (emphasis added); *see also Miranda-Sotolongo,* 827 F.3d at 669–

---

[3]We note the violation for failure to maintain proof of financial responsibility for a vehicle is titled "Requirement of Financial Responsibility." *See* TEX. TRANSP. CODE ann. § 601.051. Throughout the hearing and in the briefing, however, the witnesses and parties continually used the commonly known vernacular of "driving without insurance" to refer to this section of the transportation code.

70; *United States v. Cortez-Galaviz*, 495 F.3d 1203, 1209 (10th Cir. 2007); *United States v. Sandridge*, 385 F.3d 1032, 1036 (6th Cir. 2004).

Cases involving these types of stops fall into two categories: (1) those in which courts have held an officer did not have reasonable suspicion because the evidence was not developed to determine the database's reliability and (2) those in which courts have held that reasonable suspicion existed when the officer, through experience or training, had additional information about what the ambiguous answer from the database meant and "some idea" regarding the data's reliability. *Blankinship,* 2022 WL 336560, at *3; *Ellis*, 535 S.W.3d at 214.

To resolve the issue before us, we must review the two different lines of cases examining reasonable suspicion in the context of an "unconfirmed" response to an officer's vehicle insurance inquiry.

## C.  A Review of Courts of Appeals Cases

The two leading cases that fall into the first category, and on which appellee relies for his argument, are *Contraras v. State*, 309 S.W.3d 168 (Tex. App.—Amarillo 2010, pet. ref'd) and *Gonzalez–Gilando v. State*, 306 S.W.3d 893 (Tex. App.—Amarillo 2010, pet. ref'd). The two cases arise out of the same traffic stop. In these cases, the Amarillo Court of Appeals held that the information the officers obtained from the computer database system did not give rise to reasonable

11

suspicion to make the traffic stop. *Contraras*, 309 S.W.3d at 172–73; *Gonzalez–Gilando*, 306 S.W.3d at 896–97.

In these cases, two Department of Public Safety troopers were on patrol on a highway known as a main route for drug trafficking when they observed a vehicle pass them in the opposite direction and decided to turn and follow it. *See Contraras*, 309 S.W.3d at 169; *Gonzalez–Gilando*, 306 S.W.3d at 895. When the troopers checked their in-vehicle computers, their respective databases gave them information that the vehicle's registration was current, but the insurance information was "unavailable." *Id.* Based on this information, the vehicle was stopped, resulting in the discovery of the controlled substances underlying the defendants' convictions. *See Contraras*, 309 S.W.3d at 170; *Gonzalez–Gilando*, 306 S.W.3d at 895. The defendants subsequently filed motions to suppress which the trial court denied. *See Contraras*, 309 S.W.3d at 169; *Gonzalez–Gilando*, 306 S.W.3d at 894.

On appeal, the court of appeals rejected the State's contention that the officers had reasonable suspicion that the driver, Gonzalez–Gilando was driving without insurance. *See Contraras,* 309 S.W.3d at 172*; Gonzalez–Gilando*, 306 S.W.3d at 896–97. Although noting that modern technology has given police officers the means to assess a driver's compliance with the requirement that he maintain proof of financial responsibility, the *Gonzalez–Gilando* court stated that

12

the information obtained by the officers "was hardly suggestive of anything other than the unknown." *Gonzalez–Gilando*, 306 S.W.3d at 896. In particular, the court noted that, although the officer initiating the traffic stop stated that the "unavailable" status led him to believe that the vehicle was uninsured,

> without other evidence [1] developing the source of the information comprising the database, [2] explaining what was meant when insurance information was unavailable, [3] explaining why such information would be unavailable, [4] illustrating the accuracy of the database, [5] establishing the timeliness of the information within the database, [6] depicting how often those using the database were told that insurance information was unavailable, [7] proving that the program through which the database was accessed was even operating at the time, and the like, we cannot accept the deputy's inference as reasonable.

*Id.* at 897. Similarly, the *Contraras* court stated that the terms "unavailable" and "undocumented" were not self-explanatory and that, with "no explanation of their meaning, we are unwilling to speculate on them." *Contraras*, 309 S.W.3d at 172–73.

The State, on the other hand relies on the second category of cases—cases in which the appellate courts held reasonable suspicion existed because the officer who made the stop, through experience or training, had additional information about what the ambiguous answer from the database meant and had "some idea" regarding the data's reliability. The State points to this Court's recent analysis of an "unconfirmed insurance" return in *Blankinship v. State,* in which we held that the officer had reasonable suspicion to stop the vehicle. 2022 WL 336560 at *4.

13

Initially we noted that the officer who made the stop did not testify that the return showed "unavailable" as the officers did in *Gonzalez–Gilando* and *Contraras. Id.* The officer testified that his in-car computer showed "unconfirmed insurance, no match within 45 days on the vehicle." *Id.* Further, the officer testified that the computer's message meant it "showed no insurance" and "no vehicle coverage within 45 days." Thus, this Court held contrary to *Contraras* and *Gonzalez–Gilando*, in which the record did not explain the meaning of the database response, the officer's testimony in *Blankinship* was not ambiguous or inconclusive or "as likely to support a finding of compliance as it was for violation." *Id.* Further, we stated that nothing in either *Contraras* or *Gonzalez–Gilando* suggested that information that insurance is "unconfirmed" is insufficient to support reasonable suspicion. *Id.* Finally, we noted that the officer testified that he used the database regularly and it had been reliable, although he acknowledged on cross-examination, that the database had been wrong "at times." *Id.*

The State further relies on the Second Court of Appeals's holding in *Ellis v. State*. 535 S.W.3d at 209. In *Ellis*, a police officer for the City of Euless, stopped a driver solely because the patrol car's computer indicated that liability insurance on the driver's Jeep was "unconfirmed." *Id.* at 211. At the suppression hearing, the officer testified he had used the database "[t]ens of thousands" of times; only "a handful" of the "[h]undreds, if not thousands" of returns of "unconfirmed" he

14

received from the database were in error; and the database was "very" accurate based on his experience. *Id.* at 215. He further testified the insurance return from the database showed the Jeep's insurance status was "unconfirmed per the State of Texas," which meant that the Jeep was "not showing to have current insurance as required by Texas state law." *Id.* at 211. Moreover, he testified the return from the database would have said "insurance confirmed" if the Jeep had been insured and that his training and experience led him to conclude that the Jeep was uninsured. *Id.* As for the database, the officer testified he did not know how the database worked; he did not know if the database was web-, internet- or cloud-based; he did not know the database's requirements for accuracy; as far as he knew, the database "could be 99 percent accurate" or "50 percent accurate"; he did not know how often insurance companies reported information or how often they were required to report information to the database; and he did not know how insurance companies reported information to the database. *Id.* at 211–12. When questioned if he knew how accurate the database was, the officer answered, "I have to take it as being accurate." *Id.* at 212. The officer stated police officers "take it on good faith that the information that is provided . . . [by the database] is valid information." *Id.* The officer admitted the possibility that other "unconfirmeds" could be shown to be false when a person cited for not having insurance subsequently showed proof of insurance to a judge. *Id.*

15

At Ellis's suppression hearing, he argued the officer's "only knowledge of the database's accuracy was with his own experience as a user" and contended that his knowledge was insufficient to establish reasonable suspicion. *Id.* at 215. The Fort Worth Court, however, rejected the contention that an officer must possess the quantum of knowledge set out by the *Gonzalez–Gilando* Court and held the officer's testimony that he had used the database "[t]ens of thousands" of times, received only a handful of errors from the database, and believed the database was "very" accurate was enough to establish reasonable suspicion based on the "unconfirmed" insurance return. *Id.* at 215–16.

Moreover, the Court drew a distinction between conducting an *investigation* based on information obtained from the database versus securing a *conviction* based on information obtained from the database. The Court stated:

> We note that it would be helpful to have objective information about the database—how it worked, the timeliness of the information placed in it, and the error rate, for example—and essential if we were reviewing a conviction based on information yielded from the database rather than whether a police officer with a great deal of experience using the database had reasonable suspicion to stop a motorist based on a return of "unconfirmed" from that database.

*Id.* at 216–17 (internal citations omitted).

Additionally, the State cites the Waco Court of Appeals's opinion in *Morning v. State*, No. 10-18-00051-CR, 2018 WL 5662228, at *3 (Tex. App.—Waco Oct. 31, 2018, no pet.) (mem. op., not designated for publication), another

16

case in which the court of appeals rejected the *Gonzalez–Gilando* Court's holding regarding the quantum of information an officer must possess about an in-car database to rely on it for reasonable suspicion to conduct an investigative detention. In *Morning*, a patrol officer conducted a license-plate check on a vehicle, and the insurance status came back as "unconfirmed." *Id.* at *2. At the hearing on Morning's motion to suppress, the officer acknowledged that he stopped Morning solely because of the "unconfirmed" insurance status. *Id.* at *3.

On appeal, Morning contended his case belonged in the category of cases in which courts have held the police lacked reasonable suspicion based on the word "unconfirmed" and no other information. *See Contraras*, 309 S.W.3d at 173; *Gonzalez–Gilando*, 306 S.W.3d at 896–97. The Court of Appeals, however, pointed out the officer testified he had regularly conducted license-plate checks during his three-and-a-half years as a peace officer and that, based on his experience, the database was "very accurate that insurance is not able to be provided." *Morning*, 2018 WL 566228 at *3. Additionally, the Court pointed out the officer stated he believed the database to be "[v]ery accurate" and reliable; that he did not have any problems with the database on the night in question; and that an "unconfirmed" return meant that the vehicle was not insured. *Id.* Ultimately, the Court held the officer's testimony was "enough" to demonstrate he had sufficient specific, articulable facts upon which to base his inference that the vehicle

Morning was driving was uninsured. *Id.* As to the quantity of knowledge an officer must possess about his in-car computer system pursuant to *Gonzalez–Gilando*, the *Morning* Court stated, "[W]e are not persuaded by any suggestion that the State was required to proffer evidence in support of *all or most of the factors* mentioned by the *Gonzalez-Gilando* Court." *Id.* at \*4 (emphasis added).

**IV.** **The Trial Court Had Sufficient Information to Conclude the Database Was Reliable for Purposes of Reasonable Suspicion**

On appeal, the State asserts Officer Delgado testified to enough familiarity with the in-car computer system to understand what the "unconfirmed insurance" return meant and to understand that the system was reliable. We agree.

During the suppression hearing, Officer Delgado testified to five years of experience using his in-car computer "every single day." Additionally, Officer Delgado testified as follows:

Q.     So what came back on the license plate check when you guys ran it?

A.     The registration showed to be valid and the insurance showed to be unconfirmed.

Q.     Okay. And what does unconfirmed mean?

A.     It typically means that the insurance information on file is either out of date, expired, or there is none on file.

Q.     Okay. And if it's confirmed, what would that mean?

A.     That would mean that there is a valid regis -- no, I'm sorry. That there is a valid insurance that is not expired and associated with that vehicle.

18

Q.     And do you run this check on most vehicles that you pull over?

A.     Every single one. Yes, sir.

Q.     Okay. And through your training and experience, do you know if the information you received from the computer database is reliable?

A.     Yes, sir.

Q.     And do you have a rough percentage for the number of people who don't have insurance when the database check comes back as unconfirmed?

A.     I couldn't tell you, sir, that.

Q.     Okay. No worries, no worries.

During cross-examination, Officer Delgado testified:

Q.     Could the database be fifty percent accurate? Could it be seventy-five percent accurate? Could it be twenty-five percent accurate, or do you know?

A.     I don't know, sir.

On redirect, Officer Delgado testified:

Q.     Okay. I want to go back to the Computer Aided Dispatch. Do you use that on a day-to-day basis?

A.     Every single day, sir.

Q.     And what do you use that for?

A.     Anything from being dispatched to calls to checking a person for a valid driver's license[,] whether they are wanted or not, listed as missing. We use it to check license plates for violations, valid registration and insurance, status of stolen or any warrants associated with tags. We can use it to check for stolen property if items are listed as stolen, or if people are listed as missing or wanted.

Q. Okay. So through your training and experience you would say that that CAD system is reliable.

A. Yes, sir.

As noted above, Officer Delgado testified he has regularly conducted license-plate checks during his five years as a peace officer in Texas and based on his experience, the database is "reliable." Officer Delgado further stated that an "unconfirmed" return means "the insurance information on file is either out of date, expired, or there is none on file," and that a "confirmed" return means "there is a valid insurance that is not expired and associated with that vehicle." Thus, unlike *Contraras* and *Gonzalez–Gilando*, in which the record did not explain the meaning of the database response, Officer Delgado's testimony was not ambiguous or inconclusive or "as likely to support a finding of compliance as it was of violation." *Crawford v. State*, 355 S.W.3d 193, 198 (Tex. App.—Houston [1st Dist.] 2011, pet ref'd). Moreover, the only evidence adduced at trial was that the database was reliable; there was no evidence to suggest that it was unreliable. *See Broca-Martinez*, 855 F.3d at 680.

Given the record before us, we conclude the State developed evidence demonstrating that Officer Delgado had specific, articulable facts upon which he could reasonably conclude that appellee's vehicle was not insured. We sustain the State's single point of error. We reverse the trial court's order suppressing the

evidence in this case and remand this cause to the trial court for further proceedings.

/Robert D. Burns, III/
ROBERT D. BURNS, III
CHIEF JUSTICE

Justice Carlyle dissents without a separate opinion.

DO NOT PUBLISH
TEX. R. APP. P. 47
220544F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

THE STATE OF TEXAS, Appellant

No. 05-22-00544-CR    V.

MARTIN EDUARDO
VELASQUEZREYES, Appellee

On Appeal from the County Criminal
Court No. 1, Dallas County, Texas
Trial Court Cause No. M1922423.
Opinion delivered by Chief Justice
Burns. Justices Carlyle and Garcia
participating.

Based on the Court's opinion of this date, the judgment of the trial court is **REVERSED** and the cause **REMANDED** for further proceedings consistent with this opinion.

Judgment entered February 27, 2024