# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00801-CR

---

**Whitney Charles Frilot, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 207TH DISTRICT COURT OF COMAL COUNTY
### NO. CR2019-089, THE HONORABLE GARY L. STEEL, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Whitney Charles Frilot was convicted of the offense of possession of less than one gram of methamphetamine and sentenced to twenty-two months' confinement. *See* Tex. Health & Safety Code §§ 481.102(6), .115(a)-(b); Tex. Penal Code § 12.35. On appeal, Frilot contends that the trial court erred by denying his motion to suppress. We will affirm the trial court's judgment of conviction.

## BACKGROUND

After responding to a call about a reckless driver, police officers arrested Frilot for possession of a controlled substance. Following his arrest, Frilot filed a motion to suppress evidence obtained by the police officers during his detention. The trial court conducted a suppression hearing at which the parties agreed that the trial court would make its ruling based

on responding police officers' reports and on recordings from two officers' body cameras and one officer's dashboard camera.

The recordings showed Officers Phillip Garcia, Rebecca Moore, and Taylor Criss driving to a commercial parking lot where a man later identified as Frilot was standing next to a black car in front of a store and where a woman later identified as his wife, Carly Frilot, was sitting in the passenger seat.[1] Officer Garcia approached Frilot, asked him from where he was driving, and asked to see his driver's license. During this exchange, Carly mentioned that the vehicle belonged to her. In his report prepared after this interaction, Officer Garcia described Frilot as appearing "uneasy on his feet and possibly intoxicated" at the start of their interaction. While talking with Frilot, Officer Garcia reported Frilot's driver's license number to dispatch. In addition, Officer Garcia explained to Frilot that an individual had called the police to report that someone was driving recklessly and might have been intoxicated. One of the reports that was admitted as an exhibit showed that the caller identified himself, provided his driver's license number, described the car that Frilot was driving, and followed the car until the driver parked in front of a store.

During Officer Garcia's exchange with Frilot, Frilot and Carly both denied having had anything to drink that day. Approximately two minutes after approaching Frilot, Officer Garcia walked Frilot over to his patrol car. Frilot denied drinking any alcohol again or taking any drugs that day. Officer Garcia told Frilot that he had detected a faint smell of alcohol and asked Frilot if he would agree to perform some testing to see if he was alright to drive, and Frilot agreed. Before submitting to the test, Frilot explained that he had injured one of his eyes years

---

[1] Because Frilot and his wife share the same surname, we will refer to Frilot's wife by her first name.

2

ago in a car accident but that there was no impairment from that injury. Officer Garcia administered a horizontal gaze nystagmus ("HGN") test. During the testing, Officer Garcia had to repeat the instructions that Frilot not move his head. In his report, Officer Garcia stated that Frilot had "a hard time keeping his eyes open" during the HGN test. After the testing was completed and approximately seven minutes after first interacting with Frilot, Officer Garcia discussed the results of the testing with Officer Criss and told Officer Criss that he did not see any clues of intoxication during the testing and no longer smelled alcohol.

After talking with Officer Criss for a few minutes, Officer Garcia asked Frilot if he would allow the officers to search the car. Frilot asked why Officer Garcia wanted to search the car, and Officer Garcia explained that he was trying to determine if Frilot was alright to drive. Officer Garcia stated that he had initially detected the smell of alcohol, that someone reported Frilot driving in a reckless manner, that Frilot was having a difficult time keeping his eyes open during their conversation, and that Frilot appeared to be under the influence of some drug. During this exchange, Frilot stated that he did not get enough sleep the night before. Officer Garcia then asked whether Frilot had used any narcotics, to which Frilot answered by stating that he had not used any narcotics in months but admitting that he had been arrested for possession of heroin. For the next several minutes, Frilot described a difficult family situation that he was experiencing. After Frilot finished, Officer Garcia asked Frilot if he would submit to a search of his person, and Frilot agreed. Officer Garcia searched Frilot for approximately three minutes without finding anything before placing Frilot in the back of his patrol car and walking back to the car and interacting with Officers Moore and Criss.

While Officer Garcia was talking with Frilot by his patrol car, Officer Moore asked Carly if she would allow the officers to search her car. Carly agreed. In his police report,

3

Officer Garcia stated that after Officer Moore began searching the car, Frilot "kept looking back at the vehicle and [was] watching to see what was going on." Approximately twenty-two minutes after the police first interacted with Frilot and one minute after Officer Garcia left Frilot in the back of his patrol car, Officer Garcia returned to the car to help Officer Moore search the vehicle. Within a minute, Officer Garcia found a torch and a syringe in the center console that had a liquid residue inside it. At that point, Officer Garcia returned to his patrol car, placed handcuffs on Frilot, explained that Frilot was being formally detained, and directed Frilot to the backseat again. Officer Garcia returned to Carly's vehicle and continued searching the car.

During his search of Carly's vehicle, Officer Garcia found a glass pipe with residue inside it between the center console and the passenger seat, the bottom half of a cut aluminum can and a cotton swab with residue like the residue in the syringe behind Frilot's seat, and a container with a crystalline substance in it inside a flashlight in Carly's purse in the trunk. The officers field tested the residue in the syringe and in the glass pipe approximately fifteen minutes after the syringe was discovered. Testing on the residue inside the syringe and the pipe produced positive results for heroin and methamphetamine, respectively. During a search incident to Frilot's arrest, Officer Garcia found a container with a crystalline substance inside Frilot's pocket, and Frilot admitted that he knew about the container. After Officer Moore informed Carly that she was under arrest for possession of a controlled substance, Officer Moore searched Carly and discovered a plastic bag sticking out of Carly's bra. Carly admitted that the bag contained heroin.

After reviewing the recordings and reports, the trial court denied the motion to suppress the evidence obtained during the investigation. During the trial, Officer Garcia was the only witness to testify. In his testimony, Officer Garcia explained that a citizen called 911 to

4

report a reckless driver and relayed the exact location of the car, its description, and its license plate number. Officer Garcia testified that he responded to the 911 call and observed the vehicle the caller described in the parking lot. Officer Garcia further related that Frilot appeared "unsteady" on his feet. When describing his interaction with Frilot, Officer Garcia stated that he initially smelled alcohol and that Frilot seemed to be under the influence of a drug. Officer Garcia testified that he asked Frilot to walk with him to his patrol car, asked where Frilot was coming from and what he had been doing, and explained to him that someone called 911 to report that he had been driving recklessly. Moreover, Officer Garcia related that Frilot denied drinking or having taken any drugs that day and that Frilot did not display any signs of intoxication during the HGN test. However, Officer Garcia clarified that he believed that Frilot was under the influence of something other than alcohol and stated that Frilot had difficulty keeping his eyes open and complying with instructions during the HGN test. Next, Officer Garcia testified that Frilot admitted that he had used heroin in the past. In his testimony, Officer Garcia stated that Frilot was detained when he suspected that Frilot was under the influence of a drug after talking with him at his patrol car.

Additionally, Officer Garcia testified that he placed Frilot in the back of his patrol car before helping Officer Moore search the car. Officer Garcia related that he found a syringe in the center console, which furthered his suspicion that Frilot was under the influence of narcotics. Officer Garcia also testified that he found a glass pipe in the car with residue that tested positive for methamphetamine, the bottom of a soda can with a cotton swab that tested positive for heroin, and a container inside a flashlight with a crystalline substance later identified as methamphetamine. Next, Officer Garcia related that he searched Frilot, that he discovered a glass cylinder with a crystalline substance inside it, that Frilot admitted to knowing about the

5

container, and that subsequent testing performed on the substance produced a positive result for methamphetamine.

At the conclusion of the trial, Frilot again moved to suppress the evidence, and the trial court denied the motion. After his conviction, Frilot requested that the trial court prepare findings of fact and conclusions of law supporting its suppression ruling, and the trial court issued the following relevant summarized findings and conclusions:

**Findings of Fact**

Officer Garcia was credible.

The State's exhibits were reliable and credible.

The video exhibits were a fair and accurate depiction of the events recorded.

Officer Garcia responded to a call regarding a "reckless driver" who "might be intoxicated."

The 911 caller identified himself by his name, phone number, and driver's license number.

The 911 caller provided a description of the vehicle, its license plate number, and its exact location.

Officer Garcia approached the vehicle in the parking lot and noticed that Frilot was "uneasy on his feet and possibly intoxicated."

Officer Garcia made contact with Frilot and smelled a "faint odor of alcohol."

Officer Garcia asked Frilot for his driver's license and asked him a few questions about what he had been doing and whether he had consumed any alcohol recently.

While Frilot was answering Officer Garcia's questions, Officer Garcia observed that Frilot "appeared to be under the influence of something."

Frilot did not exhibit any clue during the horizontal gaze nystagmus testing, but Officer Garcia observed that he "could barely keep his eyes open and appeared to be under the influence of either medication or narcotics."

6

Frilot told "Officer Garcia that he had a 'lazy eye,' but [Officer] Garcia observed that 'it was more like both eyes that . . . [Frilot] had a problem keeping open' and that [Frilot] also had a 'problem keeping his head straight.'"

Officer Garcia asked Frilot if he had used narcotics recently, and Frilot admitted to using heroin in the past and to being on parole for a possession of heroin conviction.

**Conclusions of Law**

When balancing the "vital" and "compelling" need to protect the public from DWI drivers in general—and this DWI Defendant in particular, including his "reckless" and seemingly "intoxicated" driving—against the minimal inconvenience of a brief investigatory detention, Officer Garcia's stop and detention of the Defendant was reasonable.

On appeal, Frilot challenges the propriety of the trial court's ruling denying his motion to suppress.

## STANDARD OF REVIEW AND GOVERNING LAW

Appellate courts review a trial court's ruling on a motion to suppress for an abuse of discretion. *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013). Under that standard, the record is "viewed in the light most favorable to the trial court's determination, and the judgment will be reversed only if it is arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'" *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (quoting *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). In general, appellate courts apply "a bifurcated standard, giving almost total deference to the historical facts found by the trial court and analyzing *de novo* the trial court's application of the law." *See State v. Cuong Phu Le*, 463 S.W.3d 872, 876 (Tex. Crim. App. 2015); *see also Arguellez*, 409 S.W.3d at 662 (explaining that appellate courts afford "almost complete deference . . . to [a trial court's] determination of historical facts, especially if those are based on an assessment of credibility and

7

demeanor"). "The same deference is afforded the trial court with respect to its rulings on application of the law to questions of fact and to mixed questions of law and fact, if resolution of those questions depends on an evaluation of credibility and demeanor." *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). Moreover, courts "consider only the evidence adduced at the suppression hearing because the ruling was based on that evidence rather than evidence introduced later" unless "the suppression issue has been consensually relitigated by the parties during trial." *Herrera v. State*, 80 S.W.3d 283, 290-91 (Tex. App.—Texarkana 2002, pet. ref'd) (op. on reh'g). A trial court's ruling on the motion will be upheld if it is correct under any theory of law applicable to the case regardless of whether the trial court based its ruling on that theory, but "a trial court's ruling will not be reversed based on a legal theory that the complaining party did not present to it." *Story*, 445 S.W.3d at 732.

"Routine traffic stops are analogous to investigative detentions." *Martinez v. State*, 236 S.W.3d 361, 369 (Tex. App.—Fort Worth 2007, pet. dism'd, untimely filed); *see also State v. Woodard*, 341 S.W.3d 404, 411 (Tex. Crim. App. 2011) (describing types of interactions between citizens and law-enforcement personnel). Investigative detentions are less intrusive than arrests, *Derichsweiler v. State*, 348 S.W.3d 906, 916 (Tex. Crim. App. 2011), and an officer may initiate a traffic stop if he has reasonable suspicion that a crime is about to be committed or has been committed, *see Guerra v. State*, 432 S.W.3d 905, 911 (Tex. Crim. App. 2014). For reasonable suspicion to exist, an actual violation does not need to have occurred; rather, it is only necessary that "the officer reasonably believed a violation was in progress." *Green v. State*, 93 S.W.3d 541, 545 (Tex. App.—Texarkana 2002, pet. ref'd); *see Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000) (noting that officer may briefly detain person for

investigative purposes on less than probable cause where specific and articulable facts along with inferences from those facts reasonably warrant detention).

"In assessing whether the intrusion was reasonable, an objective standard is utilized: would the facts available to the officer at the moment of the seizure or search warrant a man of reasonable caution in the belief that the action taken was appropriate." *Davis v. State*, 947 S.W.2d 240, 243 (Tex. Crim. App. 1997). "[T]here need only be an objective basis for the stop," and "the subjective intent of the officer conducting the stop is irrelevant." *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001). Courts require only a "minimal level of objective justification" on the part of the officers, and "the likelihood of criminal activity need not rise to the level required for probable cause" and "falls considerably short of satisfying a preponderance of the evidence standard." *Tanner v. State*, 228 S.W.3d 852, 855, 856 (Tex. App.—Austin 2007, no pet.) (citations omitted). Moreover, the assessment is made in light "of the totality of the circumstances." *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997). Provided that the traffic stop is based on reasonable suspicion, the detention "does not violate Texas law." *Guerra*, 432 S.W.3d at 911.

"[T]he general rule is that an investigative stop can last no longer than necessary to effect the purpose of the stop." *Kothe v. State*, 152 S.W.3d 54, 63 (Tex. Crim. App. 2004). "During a traffic stop, an officer may demand identification, a valid driver's license, and proof of insurance from the driver, and may also check for outstanding warrants." *Simpson v. State*, 29 S.W.3d 324, 327 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). Further, "an officer is entitled to request information concerning . . . the driver's destination[] and the purpose of the trip." *McQuarters v. State*, 58 S.W.3d 250, 255-56 (Tex. App.—Fort Worth 2001, pet. ref'd). "If during a valid traffic stop and detention, the officer develops reasonable suspicion that the

detainee is engaged in criminal activity, prolonged or continued detention is justified." *Haas v. State*, 172 S.W.3d 42, 52 (Tex. App.—Waco 2005, pet. ref'd); *see Powell v. State*, 5 S.W.3d 369, 377 (Tex. App.—Texarkana 1999, pet. ref'd); *see also Woodard*, 341 S.W.3d at 414 (explaining that information known to officer gave him probable cause to arrest defendant for driving while intoxicated or reasonable suspicion to detain and administer field-sobriety tests). "After the initial traffic-violation stop, the officer is entitled to rely on all of the information obtained during the course of his contact with the citizen in developing the articulable facts that would justify a continued investigatory detention." *Powell*, 5 S.W.3d at 377.

## DISCUSSION

In one issue on appeal, Frilot contends that the trial court erred by denying his motion to suppress. Although Frilot concedes that the initial detention by Officer Garcia was authorized based on the report of reckless driving, he argues that the purpose of that detention—investigating his possible intoxication—ended approximately seven and a half minutes after the interaction began when Officer Garcia finished the HGN test but saw no clues of intoxication. Further, Frilot argues that Officer Garcia did not perform any other field-sobriety tests or take any further steps to continue the investigation. Moreover, Frilot contends that the recordings show that he did not have any difficulty walking or balancing, did not sway during the HGN test, did not slur his words, and answered Officer Garcia's questions in a coherent manner. Additionally, Frilot emphasizes that after the HGN test concluded, Officer Garcia admitted that he no longer smelled alcohol. Frilot also argues that although Officer Garcia stated that Frilot was having difficulty keeping his eyes open during the HGN test, the officer acknowledged that Frilot had an injury to one of his eyes. Along those same lines, Frilot highlights that he told

10

Officer Garcia during their interaction that he did not sleep well the night before, which he urges would have explained why it appeared that he was having difficulty keeping his eyes open. In his brief, Frilot also notes that no evidence was presented to the trial court indicating that Officer Garcia had any expertise or specialized training in detecting drug use or possession. In his brief, Frilot acknowledges that the search of the automobile revealed contraband, and he does not argue that the discovery of the contraband would not have given the police probable cause to arrest him or reasonable suspicion to continue to detain him. Instead, Frilot contends that his continued detention after he completed the HGN test and during the search resulting in the discovery of contraband was improper because the officers did not have reasonable suspicion to extend his detention after the HGN test and because Officer Garcia was improperly relying on a "hunch" that Frilot had used drugs and that drugs were inside the car.

As found by the trial court, a concerned citizen called 911 to report a reckless driver and to express concern that the driver might be intoxicated, provided his name and other contact information as well as a description of the car and its license plate number, and reported the car's location to the 911 operator, who then relayed that information to the responding police officers. "It is not unreasonable . . . for a police officer to rely on detailed, firsthand information received from a citizen informer who is willing to identify himself and make himself accountable for the consequences of his report." *Reesing v. State*, 140 S.W.3d 732, 737 (Tex. App.—Austin 2004, pet. ref'd) (noting that reliability of caller's tip was buttressed by fact that caller was willing to identify himself, remain on phone, and follow suspect to report his whereabouts); *see also State v. Stolte*, 991 S.W.2d 336, 341-42 (Tex. App.—Fort Worth 1999, no pet.) (observing that "a person who is not connected with the police or who is not a paid informant is considered inherently trustworthy when he advises the police that he suspects criminal activity has occurred

11

or is occurring" and explaining that witness's informing 911 of offense while watching defendant and putting "himself in a position to be held accountable for his intervention" increased reliability of information provided to dispatcher).

When Officer Garcia arrived on the scene, Frilot was near the driver's side of the parked car described by the caller, and Carly was sitting in the front passenger seat. Additionally, the trial court found that Officer Garcia noticed Frilot had balance issues and detected a faint smell of alcohol. *See Cotton v. State*, 686 S.W.2d 140, 142 n.3 (Tex. Crim. App. 1985) (stating that "odor of alcohol on the person" and "unsteady balance" are evidence of intoxication). Although Officer Garcia did not observe Frilot drive the car, the caller's description of the driver as being potentially impaired was corroborated by Officer Garcia's observations. *See Stolte*, 991 S.W.2d at 341 (observing that corroboration by police officers "of any information related by the informant may increase the reliability of the information" and that corroboration in this context means whether police officer "confirms enough facts to reasonably conclude that the information given to him is reliable and a temporary detention is thus justified"). Accordingly, Officer Garcia "had a reasonable basis for suspecting that" Frilot "was driving while intoxicated and to stop him for further investigation." *See Reesing*, 140 S.W.3d at 737; *see also Rita v. State*, No. 08-14-00098-CR, 2016 WL 419677, at *6 (Tex. App.— El Paso Feb. 3, 2016, no pet.) (op., not designated for publication) (concluding that report of defendant's "erratic driving, occurring only minutes before" officer arrived, "was sufficient to create a reasonable suspicion that" defendant "had been driving while intoxicated, or was otherwise driving in a reckless manner").

After initially talking with Frilot, Officer Garcia quickly relayed to dispatch the license plate number of the vehicle and Frilot's driver's license number, asked Frilot where he

and Carly were coming from, and informed Frilot about the call made by the concerned citizen. *See McQuarters*, 58 S.W.3d at 255-56; *Simpson*, 29 S.W.3d at 327. The trial court found that Officer Garcia asked Frilot whether he had consumed any alcohol that day. Officer Garcia then asked Frilot if he would submit to a HGN test, and Frilot agreed. The trial court found that Frilot did not display any intoxication clues during the test; however, the trial court also found that Officer Garcia observed that Frilot appeared to be under the influence of narcotics or medication and had difficulty keeping his head straight and complying with the instruction not to move his head. Further, the trial court found that although Frilot told Officer Garcia that he had a lazy eye, Officer Garcia observed that Frilot was having difficulty keeping both of his eyes open during their interaction. *See Kirsch v. State*, 306 S.W.3d 738, 745 (Tex. Crim. App. 2010) (explaining that erratic driving and post-driving behavior such as inability to follow directions can logically raise inference that individual is intoxicated at time of driving); *see also Ubesie v. State*, 379 S.W.3d 371, 377-78 (Tex. App.—Amarillo 2012, no pet.) (observing that defendant's inability to "keep his eyes open" was indicative of intoxication). In addition, the trial court found that Officer Garcia noted that Frilot appeared to be under the influence of something. *Cf. Irvine v. State*, 857 S.W.2d 920, 925 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd) (observing that officers testified that defendant appeared intoxicated when affirming trial court's denial of his motion to suppress). Accordingly, based on the totality of the circumstances and information obtained, reasonable suspicion was still present for Officer Garcia to continue to detain Frilot.

Additionally, as Frilot points out, Officer Garcia had relayed Frilot's driver's license number to dispatch shortly after initiating contact with him. But the recordings admitted into evidence also chronicled that Officer Garcia relayed that information to dispatch again after

13

he found the syringe in the center console, which occurred after the HGN test had ended. Given the multiple requests, the trial court could have reasonably concluded that Officer Garcia had requested a warrant check before performing the HGN test but that the warrant check on Frilot had not been completed until after the test had concluded. *See Jones v. State*, No. 14-15-00612-CR, 2016 WL 6886832, at *7 (Tex. App.—Houston [14th Dist.] Nov. 22, 2016, no pet.) (mem. op., not designated for publication) (noting that trial court could have construed question by officer as inquiry into whether warrant check had completed and concluding that trial court could have rationally determined "that the warrant check on appellant had not been completed before the conclusion of the HGN test"); *see also Kothe*, 152 S.W.3d at 58, 66 (determining that police officer's decision to wait for results of warrant check after determining that defendant was not intoxicated was reasonable and was simply completion of regular component of traffic stop); *Richardson v. State*, 494 S.W.3d 302, 304 (Tex. App.—Waco 2015, no pet.) (noting that "[i]t is only after this computer check is completed, and the officer knows that this driver has a currently valid license, no outstanding warrants, and the car is not stolen, that the traffic-stop investigation is fully resolved").

Moreover, during Frilot's detention after the HGN test, Officer Garcia continued his investigation by explaining why he was concerned that Frilot might be intoxicated and asking if there was any contraband in the car and if Frilot would consent to the officers searching the car and his person. The trial court found that during this exchange Frilot admitted that he had used heroin and was currently on parole for a prior conviction for heroin possession. *See Hamal v. State*, 390 S.W.3d 302, 308 (Tex. Crim. App. 2012) (providing that "a prior criminal record does not by itself establish reasonable suspicion but is a factor that may be considered" and concluding that police officer had reasonable suspicion to detain defendant, in part, because

14

defendant committed traffic violation, was nervous, and had prior criminal record, including convictions for possession of controlled substance); *Dominy-Gatz v. State*, No. 05-15-01194-CR, 2016 WL 7321435, at \*10 (Tex. App.—Dallas Dec. 16, 2016, pet. ref'd) (mem. op., not designated for publication) (concluding that officer had reasonable suspicion to prolong defendant's detention, in part, because she admitted to police officer "that she 'had a problem' with narcotics in the past"). Additionally, Frilot continued the conversation for several minutes describing his current family situation. This entire exchange lasted approximately thirteen minutes, and Officer Garcia then asked Frilot to sit in the back of his patrol car while Carly's car was being searched.

Approximately two minutes after Officer Garcia left Frilot in his patrol car and twenty-two minutes after Officer Garcia first approached Frilot, Officer Garcia found a syringe with residue inside the center console next to where Frilot had been sitting in the car. One minute later, Officer Garcia returned to his patrol car, placed Frilot in handcuffs, informed him that he was being formally detained, and returned to the car to continue his search. *See Love v. State*, 252 S.W.3d 684, 688 (Tex. App.—Texarkana 2008, pet. ref'd) (determining that time interval of twenty-five minutes between initial stop and search of vehicle was not unreasonable where that period consisted of initial stop, questioning of defendant, radio confirmation of information given by defendant, second questioning of defendant concerning inconsistencies which confirmation raised, and request to permit search of defendant's vehicle); *Howard v. State*, No. 05-11-00203-CR, 2012 WL 1150535, at \*3-4 (Tex. App.—Dallas Apr. 9, 2012, no pet.) (op., not designated for publication) (finding that fifty-minute delay between when officer first approached defendant and then placed him in handcuffs and took him into custody was reasonable where police were investigating potential crime during that interval); *see also Driver*

15

*v. State*, Nos. 05-14-00135-00136-CR, 2015 WL 3522949, at *4 (Tex. App.—Dallas June 3, 2015, no pet.) (mem. op., not designated for publication) (explaining that admission that there were syringes in car provided officers with probable cause to search vehicle).

At that point, the officers arguably had probable cause to arrest Frilot or, at minimum, reasonable suspicion to continue detaining him during the search of the car authorized by Carly. *See* Tex. Health & Safety Code § 481.125 (governing offense of possession of drug paraphernalia); *Sanchez v. State*, 589 S.W.2d 422, 423 (Tex. Crim. App. 1979) (explaining that police officers had probable cause to arrest defendant where defendant displayed syringe). Moreover, Officer Garcia's continued search of the car revealed additional contraband, and field testing performed on the residue in the syringe and in the glass pipe approximately fifteen minutes after the syringe was discovered produced positive results for heroin and methamphetamine, respectively. *See Levy v. State*, No. 05-98-01543, 2001 WL 294550, at *4 (Tex. App.—Dallas Mar. 28, 2001, no pet.) (op., not designated for publication) (explaining that police officers had probable cause to arrest driver and occupant for possession of controlled substance where officers discovered marijuana on center console); *see also King v. State*, No. B14-92-00599-CR, 1992 WL 324617, at *2 (Tex. App.—Houston [14th Dist.] Nov. 12, 1992, no pet.) (op., not designated for publication) (determining that police officer had probable cause to arrest defendant for possession of controlled substance after field testing on residue revealed that residue contained cocaine).

In light of the preceding, we conclude the police did not illegally extend Frilot's detention after his completion of the HGN test because reasonable suspicion of criminal activity arose in the course of the traffic stop and before the investigation was fully resolved. Prior to completing the traffic stop investigation, Officer Garcia had developed specific articulable facts,

16

which taken together with rational inferences from those facts, led him to conclude Frilot was, had been, or soon would be engaged in criminal activity. *See Balentine v. State*, 71 S.W.3d 763, 769 (Tex. Crim. App. 2002). Viewing the evidence in the light most favorable to the trial court's ruling, looking at the totality of the circumstances, and giving almost total deference to the trial court's determination of historical facts, we conclude that the trial court did not abuse its discretion by determining that the officers had reasonable suspicion sufficient to justify the detention of Frilot to continue the investigation.[2]

For these reasons, we overrule Frilot's issue on appeal.

## CONCLUSION

Having overruled Frilot's issue on appeal, we affirm the trial court's judgment of conviction.

---

[2] When arguing that the suppression motion should have been granted, Frilot points to an opinion from the Court of Criminal Appeals in which the Court determined that the motion to suppress should have been granted, arguing that the circumstances in that case are like those present here. *See Davis v. State*, 947 S.W.2d 240 (Tex. Crim. App. 1997). However, we believe that *Davis* is distinguishable and does not support a conclusion that the motion to suppress in this case should have been granted. *See Tanner v. State*, 228 S.W.3d 852, 855, 857 (Tex. App.—Austin 2007, no pet.) (noting that "determinations made in other cases" regarding presence of reasonable suspicion will not always prove helpful as precedent and that courts "should avoid a piecemeal comparison of similar factors in other cases"); *see also State v. Binkley*, 541 S.W.3d 923, 933 (Tex. App.—Fort Worth 2018, no pet.) (explaining that deferential standard by which suppression rulings are reviewed could potentially allow appellate court to affirm denial of motion to suppress under same circumstances that it would affirm granting of motion to suppress). In *Davis*, unlike this case, the officers did not detect an order of alcohol from the defendant or from the vehicle, determined that the defendant was not intoxicated, and learned that the defendant had no prior criminal history but chose to detain him further even though the initial purpose of the traffic stop had been completed. 947 S.W.2d at 241, 245-46.

_____

Thomas J. Baker, Justice

Before Chief Justice Byrne, Justices Baker and Smith

Affirmed

Filed:   August 11, 2021

Do Not Publish